Wright, J.,
delivered the opinion of the Court.
The prisoner was convicted in the Criminal Court of Memphis, of involuntary manslaughter, and sentenced to the Penitentiary for five years, the highest term of punishment for this offense, which consists in the unlawful killing of another, without malice, either expressed or implied, but in the commission of some unlawful act. This is the lowest grade of felonious homicide.
*63 No exception is taken to the ruling of the Judge of the Criminal Court in. the reception or rejection of evidence, nor is his charge to the jury set out or complained of, and must therefore be assumed to have been free of error.
The case comes to us upon an appeal of the prisoner, demanding a new trial upon the evidence. The prisoner is a free man of color, a hack driver in the city of Memphis ; and some witnesses state, was regarded as prudent and humane, but upon one occasion, was arrested for fast driving.
The deceased, for the slaying of whom, the prisoner was convicted, was John J. Brown, Jr., a little boy, between 8 and 4 years of age, the sou of John J. Brown, who resides in the city of Memphis, near Teste’s drug store, on the west side of Main Street. Dr. J. T. Marable, who was present, and saw the killing, testified, that he was on the corner of the pavement on the alley, in front of Teste’s drug store, on Main street, in the city of Memphis, in Sept-., 1860, at the time the child was run over and killed, by a hack driven by the prisoner, drawn by two horses.
Witness saw the little boy start to run across Main street, from Newsom’s house, which was on the opposite side of the street from where witness was, and attempt to pass directly, and not diagonally across the street; witness saw at the same time, the hack driven by the prisoner, coming down Main street ; that about the time the child got to the middle of the street, which witness estimated to be 60 feet wide between the curbings, and when the hack was some 40 or 50 feet from the point where the child was run over, Dr. Hallond, who was *64 also present, hallooed to the prisoner in a loud voice, to look out, and not run over the child. About the same time, Mrs. Brown, the mother of the child, cried out to the same effect from the top of the awning under, which witness was standing. The prisoner paid no attention to said cries by reining up, or turning his horses, but came on at the same gait, along the west side of the street, and about 10 or 15 feet from the curbing. When the hack had got within 25 or 30 feet of the child, witness sprang out to the child and towards the hack, with both hands raised, and cried at the top of his voice, and loud enough to be heard two squares, “stop boy, and don’t run over that child,” or similar words. The witnesss thought the child stopped a moment, about the centre of the street, as if frightened, but immediately started again, and from that time till run over, seemed to run as fast as he could, to get across. The prisoner did not heed said cries, and did not make any motion or effort whatever, either to stop his carriage, or turn out towards the centre of the street; that he had time to have done either, and there was no obstruction in the street to prevent his doing so, and nothing to prevent his seeing and hearing all that passed ; that witness was looking or glancing his eyes alternately, but rapidly, from the child to the hack, both being in nearly the same direction from him at the time, and just before the collision occurred : and ho is positive the prisoner made no effort to stop or to change his course, so far as he saw, but looked towards witness and the child, without evincing any concern whatever; that the left knee of the off, or right hand horse, struck and knocked the child down and both the wheels on the right side of the hack ran *65 over bis body; that Mr. Smith, who was riding in the hack, reached out and made an effort to seize the child before the hind wheel passed over him, but failed; there were two men in the hack, and it went on twenty yards before stopping after running over the child; that it stopped in front of the new Overton Hotel, and witness saw Mr. Smith getting out of the hack as he came to the door to clear a passage for fresh air, after taking the child up and carrying it into the drug store, and laying it on the counter-; the child died in a few minutes, in consequence of the injuries caused by. the hack wheels.
It further appeared 'that there was no obstruction in the street to make the collision at all necessary, the only thing being a two horse wagon, some sixty or eighty feet from the hack, on the opposite side of the street, and north of where the child was killed. The same facts are 'proved, in substance, by Dr. Holland and Prank Tigers, (both of whom were present,) save as to immaterial circumstances:— that they thought the child was passing angularly across the street; the collision was in day time, and all agree that the hack was moving at a slow, moderate pace. The said Smith, and one Kennedy, a hack driver, who were in the hack at the time oí the catastrophe, were examined for the prisoner; but their testimony, though somewhat different from that furnished by the State, falls far short of exculpating the prisoner. The most that can be said of it, especially when connected with the other proof, is, that it establishes, not that the homicide was the result of misadventure, but of a criminal want of caution and circumspection. This difference in the proof may be readily accounted for, by the superior opportunity of the wit *66 nesses outside of the hack, to observe the facts as they actually occurred; and if it were necessary, we should not hesitate to believe them, in preference to the witnesses in the defense. But the prisoner cannot escape upon the proof of either. Indeed, the evidence, as a whole, warrants the conclusion, that the prisoner deliberately saw the danger in which this little child was placed, and yet drove on; and instead of manslaughter, a more proper conviction would have been, for murder. The jury, in mercy to the prisoner, must have taken the milder view of the case. Mr. Russell, in his Work on Crimes, (1 volume, 457-461, 2d Am., from 2d Eng. ed.,) states the law tO’ be, that due caution should be observed by all persons,, in the discharge of the business and duties of their respective stations, lest they should proceed by means which are’ criminal, or improper, and exceed the limits of their authority.
This will more especially require the attention of officers of justice, and should be kept in mind by those who have to administer correction in foro domestico, and by persons employed in those common occupations, from which danger to others may possibly arise. If persons in pursuit of their lawful and common occupations, see danger probably arising to others from their acts, and yet persist, without giving sufficient warning of the danger, tbe death which ensues will be murder. Thus, if workmen throwing stones, rubbish, or other things, from a house, in the ordinary course of their business, happen to kill a person underneath, the question will be, whether they deliberately saw the danger, or betrayed any consciousness of it. If they did, and yet gave no warning, a. general malignity of heart may be inferred, and the act *67 will amount to murder, from its gross impropriety. So, if a person driving a cart, or other carriage, happens to kill, and it appears that he saw, or had timely notice of the mischief likely to ensue, and yet drove on, it will be murder. The act is willful and deliberate, and manifests a heart regardless of social duty. Involuntary manslaughter is, where it plainly appears that neither death, or any bodily harm, was intended, but death is accidentally caused by some unlawful act, or any act not strictly lawful in itself, but done in an unlawful manner, and without due caution. This doctrine is exemplified in 4 Blac., 192.
All of the facts, then, and the law being as thus stated, the conviction must stand, the judgment be affirmed and the sentence carried into effect, the term to begin from this day.